1                  UNITED STATES DISTRICT COURT
                     DISTRICT OF NEW JERSEY
2                  Civil Action No.  08-3526

3
                                        RECEIVED
4

5    ------------------------------        DEC 1 2 2008

     In Regard to the Matter of:
6                                        AT 8:30_____M
                                            WILLIAM T. WALSH
     Bayside State Prison                        CLERK
7    Litigation                         OPINION/REPORT
                                             OF THE
8    JOHN RILEY                          SPECIAL MASTER

9               -vs-

10   WILLIAM H. FAUVER, et al,

11            Defendants.

12   ------------------------------

13

14

15
                      *      *      *      *
16
            TUESDAY, NOVEMBER 18, 2008
17
                      *      *      *      *
18

19

20

21
     BEFORE THE HONORABLE JOHN W. BISSELL, SPECIAL MASTER
22

23

24

25

1

2               Transcript of proceedings in the above

3    matter taken by Theresa O. Mastroianni, Certified

4    Court Reporter, license number 30X100085700, and

5    Notary Public of the State of New Jersey at the

6    United States District Court House, One Gerry Plaza,

7    Camden, New Jersey, 08102, commencing at 1:44 PM.

8

9

10

11

12

13

14

15

16               **MASTROIANNI & FORMAROLI, INC.**

17      **Certified Court Reporting & Videoconferencing**

18               **251 South White Horse Pike**

19               **Audubon, New Jersey 08106**

20                  **856-546-1100**

21

22

23

24

25

1

2   **A P P E A R A N C E S:**

3

4

5       ROSELLI & GRIEGEL, PC
        BY:   JAMES LAZZARO ESQUIRE
6       1337 STATE HIGHWAY 33
        HAMILTON SQUARE, NEW JERSEY   08690
7       609-586-2257
        ATTORNEYS FOR THE DEFENDANTS
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              JUDGE BISSELL:  I'm now reopening the

2    matter in the case of John Riley, R-I-L-E-Y, docket

3    number 08-3526.

4              This opinion/report is being issued

5    pursuant to the directives of the Order of Reference

6    to a Special Master and the Special Master's

7    Agreement and the guiding principles of law which

8    underlie this decision to be applied to the facts

9    upon which it is based as set forth in the jury

10   instructions in the Walker and Mejias jury charges to

11   the extent applicable to the allegations in Mr.

12   Riley's case.

13             Mr. Riley was housed in Barracks Five

14   on the Farm and at some point shortly after the

15   middle of the month of August, 1997, was awaiting his

16   anticipated parole date of August 27th, 1997.  On

17   this occasion, (and I find for the record that it

18   happened sometime between the 15th of August and the

19   27th of August for reasons which I'll elaborate

20   later, but which can't be pinned down more

21   specifically) all of a sudden once again we find the

22   SOGs on the Farm.

23             I continue to be baffled as to why they

24   are there.  We've had entries in the records of cases

25   tried before in which it's been indicated that Ms.

1   Pepper who was running the Farm didn't want them

2   there.  Now, of course, they completely refused to

3   honor that request on that occasion.  As I've also

4   noted before, the Farm unit was the least likely to

5   have generated any part of either the Baker incident

6   or any possible consequences thereof in terms of

7   inmate behavior.  It was full minimum, it was a

8   coveted status and many people like Mr. Riley were

9   well on their way toward release either to a halfway

10  house or perhaps a release in toto

11             It is not unduly speculative to

12  conclude that, particularly as this lockdown wore on

13  and maybe indeed the SOG officers became less and

14  less pleased about being there, one or more of their

15  units would take recreational forays into the Farm.

16  And I find that's what happened here.

17             Somewhere around the middle of the

18  lockdown period, perhaps shortly after the 15th of

19  August, matters were adjusted so that the inmates

20  down there could begin taking showers.  Mr. Olah, who

21  testified in this case as a witness for Mr. Riley,

22  estimated that that was approximately three weeks

23  after the lockdown began  which, once again, is

24  consistent with what I've also concluded.

25             Mr. Riley testified briefly about what

1   occurred to him on this occasion as he was making use

2   of the showers.

3                    Beginning at page 12 of the transcript

4   of October 1, 2008.

5                    "Question:  Now, during that time in

6   August of 1997, did you have an encounter with SOG

7   officers?

8                    "Answer:  Yes.

9                    "Question:  And where did that take

10  place?

11                   "Answer:  In the shower, in the shower

12  room, where the bathroom and shower and everything

13  is.

14                   "Question:  Do you remember the date or

15  the approximate date of that encounter?

16                   "Answer:  Approximate date, it was in

17  August, end of July, August.  It's been 11 years.  It

18  was near the end of the lockdown.

19                   "Question:  Near the end of the

20  lockdown?

21                   "Answer:  Yes.

22                   "Question:  Do you know whether the

23  lockdown at the Farm lasted as long as the lockdown

24  behind the walls?

25                   "Answer:  No, I don't believe so.  I

1    believe the back was still locked down when I got

2    paroled.

3                    "Question:  The back was still locked

4    down?

5                    "Answer:  Yeah, I believe, because I

6    remember my mom picked me up at the bus station

7    because they drove me to the bus station.  I think

8    she said she tried to get to the back, but they had

9    it blocked off, they wouldn't let her in.

10                   "Question:  Now, when you say -- this

11   is an expression that you're using, the back, what do

12   you mean by the back?

13                   "Answer:  Behind the wall.  The back of

14   Bayside itself has a wall around it so that's the

15   back and the Farm is in the front."

16                   Skipping a little here which isn't

17   particularly important.

18                   "Question:  All right.  So how did it

19   come about that you were in the showers or in the

20   shower at the Farm on this date you were talking

21   about?

22                   "Answer:  I was in the barracks

23   upstairs and we don't have any cells on the Farm, we

24   have rooms downstairs and you progressively go down

25   as you get more time.  I was upstairs.  It's a

1   dormitory situation, and the showers are downstairs.

2   So they had us locked down and they had us sitting on

3   our bunks and they started taking one person down at

4   a time or actually two because they have showers on

5   both sides downstairs.  So they put me on the one

6   side and one on the other side.  So they was taking

7   us down for the showers one at a time and that's how

8   I was down in the shower.

9                "Question:  All right.  And what

10  happened while you were in the shower?

11               "Answer:  I was taking my shower,

12  finishing up, when I heard a noise, commotion.  Then

13  SOG came in yelling at everybody, you know.  So I

14  pulled the curtain back.

15               "Question:  So the SOG came in after

16  you heard some commotion?

17               "Answer:  Yeah, they beat the shields

18  down the walls and screaming.  Tell everybody to get

19  down, face the wall, don't look at them.  So they

20  come in the shower.  I was getting out of the shower.

21  They said get down, get down.  So I stepped out of

22  the shower and get down and one of the officers

23  grabbed my shoulder, pulled me out of the shower.  I

24  was in my flip-flops and the floor is like marble or

25  tile, I guess, and it's slippery.  And so he pulled

1    me out.  I was slipping and I fell down in a push-up
2    position to stop the fall.
3                    "Question:  So you went down to the
4    floor?
5                    "Answer:  Yeah, I went down to the
6    floor fast and I hit in a push-up position and I was
7    looking up."
8                    He later described that as looking up
9    by raising his head and crimping the back of his
10   neck, a very customary if not even reflex position
11   for the head if you're falling and then supporting
12   that fall with your arms in a push-up position.
13                    I continue now with the quote.
14                    "And he pulled me, pulled me out.  And
15   then he said don't look at me.  And then he took his
16   boot and stomped me in the back of my head, drove my
17   face into the floor, broke my nose.  I felt the
18   crunching when the nose broke.  And he said keep your
19   face down until I tell you to get up.
20                    "Question:  All right so you were sort
21   of parallel to the floor on your hands?
22                    "Answer:  Yes.
23                    "Question:  Like in a push-up position?
24                    "Answer:  Yes.
25                    "Question:  And this is when you got a

1    foot or a boot in the back of your head?

2              "Answer:  Yes, sir.

3              "Question:  You said he broke your

4    nose?

5              "Answer:  Yes.

6              "Question:  And how did that happen?

7              "Answer:  When he put his boot on my

8    head, like stomping down.

9              "Question:  Pushed your head down into

10   the floor?

11             "Answer:  Yeah.

12             "Question:  I thought I heard you say

13   something about a crunch but, again, I'm having a

14   little trouble hearing.

15             "Answer:  Yeah, my nose was broke and I

16   could hear it crunching as the nose broke.  And when

17   I hit the ground, you know, the blood started coming

18   out and he's holding me down for a while.  Seemed

19   like a long time, but I doubt it was that long, but

20   he was on my head for a while, you know, keep your

21   face down until I tell you to, you know, stuff like

22   that.

23             "Question:  All right.  Now, after that

24   happened, did you subsequently -- did you get back to

25   where your lodging was after that?

1           "Answer:  Yes, after that happened,

2    they was there for a little while and then they left.

3    And they said you can get up now.  Officer Young came

4    in.

5           "Question:  Who was Officer Young?

6           "Answer:  He was the head of the

7    barracks.  He was the officer that ran the barracks.

8    He wasn't SOG he was regular DOC and he ran the

9    barracks, Officer Young.  So he came in and he said

10   get up and he just looked at me and I looked at him

11   and he just shook his head and I went upstairs.

12          "Question:  All right.  Now, did you go

13   and seek any medical treatment for your injury?

14          "Answer:  Well, I talked to Officer

15   Young about it.  I wanted a remedy form and I wanted

16   to have some medical treatment.  And he said there

17   was no remedy forms.  He said you have to wait.  I

18   was going for parole at that time, too."

19          Let us remember, we're dealing here

20   approximately a week, maybe ten days or so before his

21   parole date.

22          Returning to the quote.

23          "So then I asked about medical

24   treatment and he said, well, yeah, I might be able to

25   do something, but if you went there, you're going to

1    cause problems for yourself, you know.  If you make

2    waves, John, he said you're going home soon, so they

3    have to fill out the papers too so they know what's

4    going on.  He said you're going home in a few weeks.

5    The best thing you can do is keep your mouth shut and

6    get out of here.  And when you hit the street, bring

7    it up, which is what I did.

8              The I there referring to Mr. Riley, not

9    the officer.

10             "Question:  So you told us, I think,

11   that you were actually physically paroled on the 27th

12   of August.

13             "Answer:  27th of August.

14             "Question:  Was that within a week or

15   two of when this happened?

16             "Answer:  Right, something like that.

17   Right."

18             I want to continue here on page 18 with

19   the connection with the medical treatment issue

20   because I think that has some importance here also.

21             I then asked him as to whether he

22   sought medical treatment at least as

23   a follow-up while within the prison.

24             And he answered:  "See, with medical

25   treatment, too, when you get paroled, you have a

1    physical.  If there is anything wrong with you, per

2    se, then they keep you there.  Okay?  Because you

3    shouldn't be paroled technically if you're hurt in

4    any way.  So if you say something, everybody knows

5    you're not going home.  And the medical treatment is

6    slow there.  It could take six months, seven months

7    to see a specialist.  So if you say something, you're

8    not going home for another year.  By the time the

9    paperwork is done, another year-and-a-half.  And

10   that's a long time when you can go home and see a

11   doctor, go home and take care of whatever you have

12   to."

13          Now, this testimony of Mr. Riley was

14   supported by the witnesses Adams and Olah who were

15   there on the Farm unit with him and also by the

16   testimony of his mother, Mrs. Riley, with regard to

17   the condition that she found him in when he was

18   released.  And also how she saw him shortly before

19   his release.

20          Now, in the course of cross-examination

21   and not surprisingly so, Mr. Riley was confronted

22   with the physical assessment describing his physical

23   condition and one taken as a prelude to his release

24   on parole.  That assessment, of course, shows

25   absolutely no abnormalities including no problems

1   with his nose or anything wrong with his head or

2   eyes.  He testified here that he got black eyes out

3   of his broken nose, not surprisingly.

4                    However, that assessment is dated

5   August 15th of 1997 and at some point in this record

6   I had questioned Mr. Riley about whether it was

7   customary if he was being released nearly two weeks

8   later to have had a follow-up physical as a matter of

9   routine and he said no.  He said this was it.  And I

10  determine, therefore, based upon the preponderance of

11  the credible evidence that the incident that occurred

12  to him in the shower occurred after his physical

13  exam.  And accordingly, the condition of his face,

14  his eyes, his nose, et cetera, did not exist when the

15  exam of August 15th took place.

16                   No evidence was presented in the course

17  of these hearings to explain in any way whatsoever

18  why the SOG unit was engaged in this foray to the

19  Farm at that time.  Mr. Riley's testimony as

20  supported by his fellow witnesses stands virtually or

21  at least materially unrefuted.  This is clearly the

22  use of sadistic and excessive force within the

23  comtemplation of the jury instructions in our

24  definition of an Eighth Amendment violation of cruel

25  and unusual punishment.

1            In addition, I find that this conduct

2     is so egregious (although not prolonged) as to

3     warrant and support a verdict for punitive damages.

4     The jury instructions on this issue are included,

5     among other things, in the Walker charge delivered on

6     May 21st, 2004 by Judge Kugler.  In that definition

7     and it's lengthy, I'm not going to go into it in

8     toto, although I do incorporate it by reference, it

9     mentions to the jury that if you find that the

10    defendant's conduct was motivated by evil motive or

11    intent or that the defendant engaged in reckless or

12    callus indifferent conduct to the plaintiff's

13    federally protected right to be free from cruel and

14    unusual punishment, you must consider whether or not

15    to award punitive damages to the plaintiff.

16            That's exactly what happened here.  The

17    man is ordered to get on the floor, he's pulled and

18    hauled to the floor before he even has the chance,

19    that's bad enough.  But when he's falling on the

20    slippery tile floor, coming out of the shower soaking

21    wet in flip-flops which are unstable foot gear,

22    instead of just allowing himself to bounce off the

23    floor with no effort to break his fall, puts his arms

24    out into a push-up position and then is stomped into

25    the floor by the officer in the wake of that, I find

1    it very difficult to think of any conduct that could

2    be considered more evil, reckless or callus.

3              Furthermore, there was absolutely no

4    reason for the imposition of any discipline or the

5    like on Mr. Riley for anything that occurred.  And,

6    as with the case of most people on the Farm, he's

7    absolutely no threat to prison security and in his

8    case perhaps even more so because he's ten days to

9    two weeks away from parole.  Less than two weeks.

10              The injury to his nose, like any broken

11   nose (and there isn't probably one of us who hasn't

12   had it happened to us at least once) healed over

13   time.  He still has some residual problems breathing,

14   as he testified at one point and he now snores more

15   than he used to.  But I find that basically as with

16   anything else, the broken nose has healed and doesn't

17   represent a permanent disability.  Although painful

18   at first and obviously difficult to deal with, it has

19   eventually rectified itself.

20              To reiterate, there was indeed

21   excessive, unnecessary and sadistic force imposed

22   upon Mr. Riley here by the SOG officer who stomped

23   him in the shower within the comtemplation of those

24   legal principles.

25              Furthermore, this level of conduct rose

1    to such an egregious level consistent with the

2    definition of punitive damages in our jury

3    instructions that it does, indeed, support a claim of

4    this plaintiff for punitive damages.

5                As those jury instructions remind us,

6    quantification of punitive damages is not an exact

7    science.  Indeed, it's rather inexact.  There are a

8    number of considerations set forth in that

9    instruction which I need not elaborate.  It involves

10   the exercise of a measure of judgment which I think I

11   can bring to bear here as the fact finder.

12               Finally, although not every item of

13   evidence has been discussed in this opinion/report,

14   all evidence presented to the Special Master was

15   reviewed and considered.

16               And accordingly I recommend in this

17   report that the district court enter an award of

18   eight thousand dollars in compensatory damages and 20

19   thousand dollars in punitive damages in Mr. Riley's

20   favor.

21

22

23

24

25

1                   C E R T I F I C A T E

2

3        I, Theresa O. Mastroianni, a Notary Public and

4    Certified Shorthand Reporter of the State of New

5    Jersey, do hereby certify that the foregoing is a

6    true and accurate transcript of the testimony as

7    taken stenographically by and before me at the time,

8    place, and on the date hereinbefore set forth.

9        I DO FURTHER CERTIFY that I am neither a

10   relative nor employee nor attorney nor counsel of any

11   of the parties to this action, and that I am neither

12   a relative nor employee of such attorney or counsel,

13   and that I am not financially interested in the

14   action.

15

16

17

18                    '    ,

19   ___JO Mastroianni_____

20   Theresa O. Mastroianni, C.S.R.
     Notary Public, State of New Jersey
21   My Commission Expires May 5, 2010
     Certificate No. XIO857
22   Date: November 18, 2008

23

24

25